Good morning, Your Honours. Amanda Schaffer-Berman of Kroll & Moring on behalf of Antrix. I'm going to try to reserve four minutes for rebuttal. Your Honours, this case is about whether an arbitral award issued in India regarding a dispute between two Indian companies over a contract executed in India and that has now been set aside by the Court of Competent Authority in India should be enforced in the United States against my client. Now, Your Honours, the parties have raised some very important legal issues here in these appeals, such as whether a foreign state-owned company is entitled to due process. We think the Supreme Court and this Court's precedent answer that question yes and nothing about this case should merit a different answer. But, Your Honours, I want to start with the most recent development in this long-running saga. And, Your Honours, that's the Delhi High Court's decision setting aside the award, which has now been affirmed on appeal by the Delhi High Court. As the D.C. Circuit has explained in Termo Rio under Article 5.1e of the New York Convention, an arbitration award does not exist to be enforced if it has been lawfully set aside by the Court of Competent Authority in the state in which the award was made. Why isn't a motion under Rule 60b-5 the appropriate way to deal with that? I mean, we can resolve the issues before us in this appeal and then you can go to the district court and raise that. Why isn't that a better way to proceed? Your Honours, we think it's an equally available mechanism, but we don't think it's the better way to proceed here, and that's for a couple of reasons. First off, this Court has long exercised its traditional authority under Subsection 2106 to do exactly what we're asking here today. For example, in United States v. Ameline in 2005, this Court directed a limited remand for the district court to provide its views on a new development regarding a sentencing issue. And the Court said, and I think this is true here, this is the shortest, the easiest, the quickest, and the surest way to find out if the district court would have reached a different conclusion. But you're not requesting a stay of these proceedings, so you still want a ruling on these appeals, right? Your Honor, what we think makes sense here, we did file the motion for a limited remand before argument, and we still think it would make the most sense for this Court to grant the limited remand, to allow the district court to weigh in, to amplify the record regarding the effect of the set-aside, and then that issue could be briefed before this Court through supplemental briefing and decided alongside the appeals. Because, Your Honor, if the set-aside decision has its usual effect that it has under Termo Rio, under the Second Circuit's decision in the Esso and the Tilao-Lignite cases, this Court won't need to reach the other issues. But the decision in India is probably going to be subject to further appeals. Your Honor, actually that's not, that's far from certain. So the process in India, they have already exhausted their two statutory appeals to which they are entitled. There is now a process that is somewhat similar to our Supreme Court certiorari process. And under that process, Davis has until June 14th to file what's called an SLP, a special leave petition. If it files that petition, and we don't know that it will,  Any reason with all of the litigiousness of these parties to think that they're not going to file that? No, Your Honor, but there's good reason to think it probably won't be granted. Because like here, most petitions for certiorari are not granted by the Supreme Court. Most SLP petitions are not granted. In fact, most are disposed of at an initial stage that takes place only about a month or so after the petition is filed. And it's only a month in this case because the Court is, I believe, in recess in June. So we may well know soon, as early as mid-July, first whether there's been a petition, and if it's been immediately denied. Now, it's possible that it could be granted and there could be a further notice process, and then there would be briefing, etc. But so, Your Honor, I think the judgment in India is as final as any judgment from this court when it issues it, and we should not be assuming that something's going to happen to change that. And, Your Honor, what we think can't happen now, however this court chooses to proceed, now that the award has been set aside, is for the court to simply affirm the decision below without considering and addressing the issue. Davis assured the District Court that there was no harm in enforcing before the Indian courts decided whether the award should be confirmed. It said, and I'm quoting from the transcript from the October 14, 2020 hearing, if the ultimate decision in India is that the award is somehow rescinded, then money is returned. So we think it would be unjust to now simply ignore the Delhi High Court's decision. And, Your Honor, I don't think there's any reason that the process for teeing up this important issue needs to be any more complex than what this court has traditionally done under its broad authority under 28 U.S.C. 2106 to grant a limited remand so the District Court can weigh in on the issue and then the court can consider that augmentation of the existing opinion and ask for supplemental briefing as appropriate and have that issue teed up alongside the other issues here. I'll ask you another question. How is an arbitration that is supposed to be conducted according to ICC rules supposed to be done without the ICC? So, Your Honor, well, that takes us to one of the other reasons that we believe that the award below cannot be enforced. So let's go to the text of the arbitration agreement here, because what it says in Article 20C, it says only that the arbitration will be conducted in accordance with either ICC or UNCTRAL rules. It does not say that the parties will submit their dispute to the ICC to administer. And the reference to UNCTRAL is quite significant, Your Honor. The ICC rules say if a party fails to nominate an arbitrator, the appointment shall be made by the court, and that's referring to the ICC. So if you agreed in your agreement for lease of space segment capacity between Antrix and Devas, if you agreed that ICC rules may apply, then you would have to agree to all of the provisions. Your Honor, that's not accurate. So actually, I think it's quite notable that since the contract was executed, the ICC has changed its rules to make that the case. The ICC rules now say that if you invoke our rules, you get us, you get ICC administration. They did not at the time. And, Your Honor, the reference to the UNCTRAL rules is quite significant, because UNCTRAL, unlike the ICC, does not administer arbitrations. It's not a body. So by referencing an arbitration that could be conducted in accordance with one of two sets of rules, I think the parties made it quite clear that they were talking about an ad hoc arbitration that could follow some of the ICC rules, but they also set out different rules. For example, 20A, their own procedure for selecting arbitrators. 20E requires a decision within 30 days of submission. That is not what the ICC rules say, Your Honor. The ICC rules say the minimum is six months, and that's an expedited process. Couldn't you have invoked the uncontrol, the U-N-C-I-T-R-A-L? Couldn't you have initially invoked those rules, and then the argument would be it had to be ad hoc, not ICC? So, Your Honor, we think what the contract makes clear is that it had to be ad hoc, and it could then either be conducted in accordance with ICC rules or in accordance with UNCTRAL rules. But that's not what happened. They rushed to the ICC, and our client, Antrix, objected at every possible interval to the ICC proceeding. And notably, the first thing the ICC did when it got the submission from DeVos was say, wait a second, this is not consistent with our rules. The way you have in Article 20G, the method for dividing up costs is not consistent with our rules. You need to change that if you want us to administer this dispute. Now, the ICC court then walked that back, but I think that initial reaction is quite telling in showing that this was not an agreement to have the ICC arbitrate. This was simply an agreement that provided ICC rules as an option within the context of an ad hoc arbitration. And, Your Honors, I'd like to speak a bit about the due process issue, because if this court does reach the other issues presented and does not simply go through the limited remand process initially, then it should reverse the decision below, because Antrix is entitled to due process, and the district court lacked personal jurisdiction. Your Honors, all parties agree that foreign state-owned companies are generally entitled to due process. The Supreme Court has so held, for example, in the Helicopteros case, it stated unequivocally that due process applied to limit the power to assert personal jurisdiction over that state-owned company. And it reversed because there weren't sufficient contacts between the U.S. and the foreign state-owned company there. I would agree that in Weltover, there's definitely an indication that they wouldn't be, because if U.S. states are not persons, then why should foreign states be? Why should foreign states be privileged above states within the United States? So, Your Honor, to even get there, we have to pierce the veil between this state-owned company and the state. So the Weltover argument only applies if this Court agrees that under the Bankheck analysis, you pierce the veil and you consider my client part of just the Indian government. We don't think that's right, and I'll explain why in a minute. But even if we assume that for a second, Weltover did not undermine, let alone overturn, this Court's line of precedent. It's holding in Gregorian where it said if defendants are not entitled to immunity under the FSIA, a court must consider. Can I look at the report of the committee constituted by the Department of Space for the review of the working and structure of Antrix Corporation? It defines Antrix as the commercial arm corporate front of the Department of Space ISRO. It's a virtual corporation housed within DOS ISRO. If you look up, it calls it an extended arm of ISRO, refers to it as a corporate front multiple times. Your Honor, so we're getting back to the Bankheck analysis here, and I think the first key point is that the district court didn't even do a Bankheck analysis. It doesn't mention the case. If you look at its decision at ER38, there's about a paragraph of sort of statements about the company, some along the lines of what Your Honor just said. But even if we set aside that the district court didn't do a proper Bankheck analysis, the things you're pointing to are simply typical attributes of a government-owned company, as the Bankheck court itself recognized. You could say many of those things about any state-owned company,  simply that it's a commercial arm says nothing. What is required under this court's decision in Holy See and in Flat Out is day-to-day control of the company by the government. And Your Honor, the very report that you are citing from says a couple of things that I think show that that is absolutely lacking here. For example, and you can see this at ER pages 216 to 219, to begin Antrix has several directors that are not government officials. They're private individuals. It says on page 217, Antrix has no prescribed level for reporting or obtaining approvals from DOS, from the Space Department. So the chairman of ISRO is the chairman of your board of directors? Yes, Your Honor. Two-thirds of the directors are drawn from ISRO and from the Department of Space. Your Honor, again, that's pretty typical for many government-owned companies. The question is, is there day-to-day control? Also on page 218, we have a statement from the Department of Space noting that Antrix keeps a chunk of its own revenues from its activities and as a result has a substantial amount of resources of its own. And also on 219, the report stresses the importance of ensuring independent review, due diligence, and compliance with laws. Antrix pays taxes like any other company. ER 217, the integration of different roles like secretary, DOS, and chairman, Antrix Corporation can result in difficulties in maintaining the separate roles. Your Honor, again, the standard is day-to-day control, and I think that there's some overlap, that there's some level of personnel that are affiliated with the government. That's true for about any government-owned corporation as recognized in BANCCAC. A moment ago, I think you were about to tell us, if you lose under the BANCCAC analysis and it effectively is the foreign state, what sense does it make to say that a foreign state is a person under the Due Process Clause? Your Honor, there's good reasons that this court has always taken that approach. To begin with, weltover doesn't undermine. There's a CF that simply notes the case, noting that states are not so treated. But there are fundamental differences between foreign nations and states of the union. Comity is due to foreign nations, and BANCCAC emphasizes that multiple times in a way that it isn't to states. Comity is one thing, and judicially enforceable constitutional rights are quite another. If we look at international relations at the time of the adoption of the Fifth Amendment, do you think Jefferson had to give the Pasha of Tripoli notice in a hearing before attacking the Barbary pirates? Your Honor, if we want to go back to the depths of history, then I think our argument becomes stronger. Because if we look at the Schooner Exchange versus McFadden, for example, that case consistently refers to France as a person, as him, as his. And that's because at the time, foreign sovereigns were people. They were the kings, the heads of the state. And so it was quite common to talk about them using the term persons. As we pointed out in our brief, Madison did the same. So I don't think there's anything ahistorical about it. And, Your Honor, on the flip side, I think it would be very incongruous to say that foreign people get due process, foreign companies get due process, but foreign states don't, despite the importance of comity noted by the Supreme Court in Bangkok. So I don't think this Court should presume that the Supreme Court would actually go the other direction. And this Court's precedent after Welthoever has continued to apply due process protections. I point the Court to its decision in the Corso case in particular, where it says, as the secondary ground for its decision, the FSIA requires a nexus between the activity of the foreign sovereign and the plaintiff's cause of action. The dealings between the parties created no minimum context with the United States. It did a minimum context analysis. This Court also did a minimum context analysis in the Altman case, which was against the government of Austria. What's your best argument that minimum context is not satisfied here? Oh, absolutely, Your Honor. So there are only two things that are pointed to that could possibly give rise to minimum context here, a meeting in 2003 and a meeting in 2009. This is a contract that was negotiated in India with a meeting in Vancouver, as Intervenors' Own Declarant notes this, and you can see that at Intervenors' SER, page 31, I believe, he notes that, sorry, 29, he notes that negotiations were in Bangalore and they were in Vancouver. This meeting in 2003 was between Antrix and a third party, Forge Advisors. That was two years before the contract with Davis. That was a year before the Forge Advisors proposed, in meetings in India and Vancouver, even creating Davis, initially thought to be a joint venture with Antrix, which Antrix then rejected that approach. So we are well before anyone is discussing the creation of Davis or talking about the possibility of this contract. And, Your Honor, I'd point to this Court's decision in the Gonzalez case where it said that even meetings in the United States between the parties, and that's not what happened here, are not relevant if they're not about the contracted issue. And this is a very different circumstance, Your Honors, from the global commodities trading case, which, Judge Miller, I know you were on the panel there. That was brought by a California plaintiff where there was a continuous course of business activity in California, including the promises central to this dispute. Here we have two meetings with entities that are not Antrix. The first, sorry, between Antrix and Forge Advisors, the 2009 meeting was between Davis and an ISRO official. And in the declaration about this meeting from their own declarant, Mr. Biswanathan, at Intervenors SER, he says, I met with ISRO. I met with ISRO. He does not say Antrix. It was also not about the contracted issue. Davis was presenting to ISRO about other potential possible future ventures. And you can see that in the next declaration in their supplemental excerpts of records at pages 33 to 34. Corso didn't analyze due process, did it? Your Honor, it did. It did? Are you saying it did? Yes, Your Honor. We believe that that was one of the holdings of Corso towards the end of the case. After it talks about whether the exceptions apply, it says another basis for the decision is that the FSAI requires a nexus between the activity of the foreign sovereign and the plaintiff's cause of action. And so, yes, I think that is an independent ground for the Court's decision in Corso. And there was certainly a full minimum context analysis in the Altman case as well. And before that, before Weltover, of course, we have the Gregorian decision where this Court very clearly said if defendants are not entitled to immunity under the FSIA, a court must consider whether the constitutional constraints of the due process clause preclude the assertion of personal jurisdiction. This Court should not overturn that line of precedent. You have a minute and 43 seconds. I will reserve the rest for rebuttal. Thank you, Your Honor. Mr. Street. Thank you, Your Honor. May it please the Court, Aaron Street on behalf of DeVos Multimedia, Private Limited. I'll try to reserve five minutes of my time for rebuttal. I'd like to start off with the questions about the remand. We agree with the suggestion that the proper course would be a Rule 60b-5 motion by Antrix. That seems to be the course that has been taken in other instances in other states. Circuits where judgment has been confirmed in the United States but then has been set aside in a foreign jurisdiction. We recognize the Court could do that through an indicative ruling procedure if Antrix wishes to file that, or, of course, it could do that after this Court rules on the issues before the Court today. But with that introduction, I'm, of course, happy to take any questions about the confirmation appeal, but given my limited time here, I would like to focus on the registration appeal because that has immediate and ongoing impacts on the liquidator regardless of what happens on the remand. Of course, the award could be set aside at some point by the District Court on the remand, and that could moot, in a sense, the issues of the confirmation appeal. But the registration appeal is existential to the liquidator because it determines who has the right to register and enforce the judgment right now in the United States, and it sets a precedent of whether only the liquidator or whether rogue subsidiaries or shareholders have the ability to enforce that judgment around the world. In this case, the District Court allowed DMAI, which is a wholly owned subsidiary of my client, Davis, and the shareholders of Davis to do an end run around the stay-on enforcement that was in place from the Indian court system that prevented my client, Davis, controlled by the liquidator, to go forth and enforce the judgment in the United States. So we had groups that we did not control taking our judgment and registering it and then going and enforcing on it and keeping the money in their bank account in the Eastern District of Virginia. Can I ask you a question? Please, go ahead. Your collection services agreement between Davis and Davis Multimedia America Inc. has a provision that any questions, claims, disputes, or litigation concerning or arising from this agreement shall be governed by the laws of the state of Delaware, but it seems that all the parties are just litigating Washington state law. Can you explain why that's the case, and if Delaware law applies, what are the authorities that we should look to for an answer? Yes, Your Honor. All of the parties have agreed to this point that it's Washington law, and the district court agreed with that as well. Even though that's not what Article 7, Enforcement of Agreement, Section 7.1, says? Well, I think it's because it has to do with whether there's an assignment, which is a procedural question that the federal rules would look to Washington law on, but I will hasten to add, Your Honor, we talk about in our brief, we have a footnote in our brief that says we recognize the Delaware Choice of Law Clause, and Delaware looks to the same sources of law that Washington law looks to, and no parties have suggested there's any difference between Washington law and Delaware law, so I think in the ordinary course... So everyone's in agreement? Yes. We're content with Washington law. So the CSA authorizes DMAI to take all actions necessary to protect, defend, and enforce the award. So setting aside the shareholders, why doesn't that authorize...? It seems like going and registering the judgment is a fairly obvious thing that you might do in the exercise of that grant of authority. Why haven't you authorized them to do that in that clause? It's not a grant of authority. It says that DMAI agrees to do this, so it's called a services agreement. This is an agreement we entered into with our subsidiary. Well, I should say the former management of DAVAS entered into with its subsidiary, and Section 2.1 of that agreement, I think, is quite responsive to your question, and it says DAVAS, quote, engages and retains DMAI to collect on behalf of DAVAS in exchange for a fee. So this is just a contract. It doesn't have the words of assignment. And Washington law teaches us for DMAI to be able to go into court and register and enforce a judgment, we need a complete assignment of the right to enforce and collect. But we know that's not the case because DAVAS went into U.S. court and has sought to confirm and enforce the judgment in the United States. The key Washington case here is a case called Amend, and that says that we need to be looking for things like the traditional words of transfer or assign. We don't have that here. We have a services agreement. We look at whether the alleged assignor has retained a right to terminate or revoke the agreement. It's undisputed that DAVAS has that right here. We also see throughout the agreement that DAVAS retains all control over the process and DMAI is supposed to follow DAVAS' instructions. And we know that they are not following our instructions. As we point out on page 24 of our reply brief, when DMAI went to the Eastern District of Virginia to enforce this judgment, DAVAS directly instructed it to cease all enforcement activities because they are subject to the stay in the Indian court system just as much as DAVAS is, and DMAI disregarded those instructions, garnished Antrix's account, and put the money into its own bank account. Then maybe you have a breach of contract action against them, or maybe you could invoke... There's a termination provision in the agreement, but you haven't terminated it, have you? We have not terminated it, but we've certainly revoked their authority to go forward and do any further enforcement by virtue of instructing them to cease those activities. Why haven't you just terminated the agreement? The liquidator has limited resources, and it has to pick its battles. Right now, the battle we're in is the battle that the district court placed us into about who has the right to enforce the judgment. We don't really have the resources at this time, and we may in the future open up another collateral litigation front in Delaware over a breach of contract. We know that even if we terminate, DMAI is likely to disregard that, is likely to sue and countersue us, and we're in for years of litigation in Delaware. So the question is before the court right now. We think that DMAI cannot claim the benefits of an agreement and also disregard express instructions under that agreement. But at a bare minimum, the fact that it's undisputed that DAVAS has the ability to give those instructions shows that it's DAVAS's judgment to collect and not DMAI's. This judgment, the judgment at issue in EDVA is about $150,000, is that right? It's five or six figures, yes. Yeah. Are there other assets elsewhere in the United States that you anticipate becoming at issue? I guess the question is the amount of resources being devoted to this question seems out of proportion to the amount of that judgment. So let me answer that by saying two things. First of all, the stay in the Indian court system is now lifted, so DAVAS, my client, is now free to go and enforce the arbitral award and the U.S. judgment. So it is now something where it's absolutely unacceptable for us to have dueling subsidiaries and shareholders enforcing with us. To directly answer your question, both DAVAS and the interveners have been seeking those assets, both in the U.S. and around the world. We've not identified at this time any further assets, but we anticipate that there may be some out there. And what's unacceptable to the liquidator is that if we uncover some seven- or eight-figure asset of Antrix, that we should somehow be dueling with our subsidiary or shareholders to take into custody those funds for the benefit of all of DAVAS's stakeholders, not the shareholders and DMAI, which is acting in league with the shareholders, jumping the queue and taking those funds into their own custody for the benefit of themselves. I will also say it's troubling to us to have a ruling on the books that our wholly owned subsidiary, which is acting under a services agreement with us, has some independent right to go out and enforce judgments. That's something that's relevant to litigation proceedings all around the world, and that's what we're asking for reversal on immediately in this case. Can we go to personal jurisdiction? I have two questions. First is, your brief doesn't address the minimum contacts, and it is your burden on purposeful availment in showing that the claims arose out of the forum activities of Antrix.  We didn't address that because we believe the much stronger argument that we wish to prioritize was that a foreign state and a foreign extensively controlled state-owned company does not have any due process rights to invoke in the first place. But let me ask you something. The problem that we have is Miller v. Gamey, that unless it's clearly irreconcilable, we're obligated to still follow the Ninth Circuit precedent, which I think goes the other way. So what's your view? Are you conceding that you don't have minimum contacts if you don't have a response in your brief and in oral argument? No, we agree with the bottom line of the district court that they had minimum contacts, but let me turn back to the question about whether Ninth Circuit precedents are reconcilable with Weltover, et cetera. Because in this court's en banc decision in Casserer v. The Kingdom of Spain, which is cited in the intervener's brief, this court recognized that it is an open question whether the foreign states have a due process right. So the en banc court wouldn't have said that's an open question if it were bound by previous circuit precedent. But even if there isn't a due process right in this context, we have a lot of case law that suggests that we read the FSIA to incorporate a minimum contacts requirement. So assuming that whether it's under the statute or under the Constitution, like we do have circuit precedent that says that you have to establish minimum contacts, what's the best case that you've done that? Well, I'm not sure there's a case, but there is... Well, I'm sorry, what is your argument that you've done that? And I'll try to answer this and then save some of my time. But the statute, the FSIA, and the sister statute which looks at the FSIA, which I'm now forgetting the name of, says that if there is an absence of immunity under the FSIA, then there's no personal jurisdiction issue anymore. Personal jurisdiction can attach to the foreign sovereign. And here we have antrics conceding they're an instrumentality or an agency of the foreign state, and they're not immune because of the arbitration exception to the FSIA. So we don't need some additional... We don't need to go through the minimum contacts analysis under the FSIA because they have no... They concede there's personal jurisdiction under the FSIA, and their only defense is due process. Well, we'll make sure you get enough time for rebuttal. But, I mean, so it's your view that... You are reading their position, and I guess we can ask them to clarify their position, to be that if the... If there's no immunity under the FSIA, then minimum contacts are off the table? Is that your... You're saying that's how you understand their argument? Yes. I mean, there's essentially various grounds for invoking jurisdiction over a foreign state under the FSIA. There's an exception to immunity for enforcing arbitral agreements. Everyone agrees that applies here. So antrics has not raised an argument about minimum contacts under the FSIA because you only get to minimum contacts under the FSIA if you're looking at the commercial activity exception or some other way to get jurisdiction over the foreign state, as opposed to the arbitration exception. And if we... But if, disagreeing with that, we were to think that minimum contacts were necessary... I guess I have two questions on that. First, as I understand it, you have not made the argument that the presence of assets in the United States that you are seeking to collect on by enforcing the arbitration agreement under the New York Convention, that that alone constitutes a sufficient minimum contact? Right. You have not? We've not made that argument. Okay. So it comes down to the various meetings that Judge Koh alluded to earlier? That was the basis of the district court's ruling.  We also, of course, urge this court not to create a post-Weltover circuit split on whether foreign states have any due process rights in the meantime. I don't think Antrix has raised an FSIA minimum contacts question. It's only raised a due process minimum contacts question. Okay. Thank you. And then we'll give you three minutes. Thank you. Mr. McGill. Thank you. And Judge Miller, and may it please the court, Matthew McGill for the interveners. Since the liquidator didn't feel the need to defend the judgment, I've got a lot of ground to cover here. Let me quickly start with the motion for a limited remand. Antrix suggests a remand to determine whether the award can be confirmed, but that confirmation, of course, happened in November of 2020. So for there to be a remand, there first would have to be a vacatur, and Antrix has provided no basis for this court to do that. The proper procedure, if Antrix wishes to obtain a vacatur, is to seek an indicative ruling on a Rule 60 motion from the district court. For reasons Antrix alone can explain, it has declined to do that. Judge Koh, I want to jump to your question about circuit precedent on the due process question. Gregorian did not decide this question. Gregorian does not address whether a foreign state is a person under the Fifth Amendment, and that is the crucial question here. Neither does Thomas P. Gonzalez. Both Altman and Theodore H. Davies versus, I believe, it's the Marshall Islands, in both those cases, this court treated the person question as unresolved. Footnote 3 of Theodore H. Davies says, we need not decide that question. We can just assume it's a person. The due process discussion in Gregorian is very clearly dicta. It starts by saying, we don't need to address the Rule 60b-4 issue because we vacate under Rule 60b-6. And it's predicated... But isn't well-reasoned dicta binding on us? It is not. Why? Because it's predicated on a misreading of Thomas H. Gonzalez. Gonzalez holds... Gonzalez was... Gregorian reads Gonzalez as holding, in all cases under the FSIA, personal jurisdiction requires due process minimum context. That's how Gregorian reads Gonzalez. But the last line of Gonzalez is, we don't decide... We don't even consider whether this case is covered by the FSIA because the FSIA, of course, had not... It was not clear that it was retroactive at that point. Gonzalez was speaking, in fact, only to the action in front of it. And this gets to your question, Judge Miller. In that case, if the FSIA... If the FSIA applied at all, personal jurisdiction did require minimum context because subject matter jurisdiction was predicated on the commercial activity direct effects exception to the... to sovereign immunity. So that's 1605a. And under the direct effects test, that has been held to incorporate a minimum context analysis. It's not that minimum context applies generally under the FSIA. It applies specifically when the subject matter jurisdiction is predicated on direct effects in the United States. That was the assertion in Gonzalez. And that was... Gonzalez, speaking only of the case before it, says you have to have minimum context to get personal jurisdiction. So I would, Judge Koh, respectfully submit that Gregorian's dicta is not well-reasoned on that specific point. But in any event, Gregorian definitely does not address the person question. And was Gregorian also a... I can't remember. Was that also a commercial activity exception case? It was. It was. But it does purport to address personal jurisdiction and require minimum context as well. So, Judge Koh, addressing this question of why we should treat antrics as part of the government of India, you focused on the right document, which is the Department of Space's own report about antrics. I just want to highlight a couple of other pieces of that in which the Department of Space itself emphasizes how antrics is different from typical public corporations. It says... Not only does it say that antrics is a corporate front, but it says, and I'm quoting from page 221, an integral part of DIDOS-ISRO, unlike a typical public sector undertaking. Further, page 212... What's that? I'm sorry. It's page 221, Your Honor. And I'll have to flip to it to get to the paragraph. That is paragraph 4.2, Your Honor. Antrics in its present concept is an integral part of DIDOS-ISRO, unlike a typical public sector undertaking. Thank you. Flipping back to page 212, Your Honor, not only is it a corporate front, I'm sorry, but sticking on 221, it's a corporate front. Sorry again, 212. All the board members are appointed by the Department of Space, and this is paragraph C in the introduction, Judge Koh. Appointed by the Department of Space instead of by the Public Enterprises Selection Board. So here again, the board members are appointed directly by the parent agency. Again, on 217, the cost and responsibility for Antrics' commercial activities, this is paragraph 3.3, Romanette II, cost and responsibility for most of the commercial activities of Antrics is on the budget of the government and not the corporation. Finally, the best was at page 224. In the conclusion... Can you... Do you have any thoughts about the minimum contact arguments that have been made today by Antrics? I do, Your Honor. Okay. So we think that, first, there's factual findings here made by the district court at pages 12 and 13 that are completely unchallenged. In 2003, Antrics came to the United States and signed a memorandum of understanding with Forge Advisors. This is not some separate company. This is Ram Viswanathan's company. And Ram Viswanathan then goes on to propose the creation of Davos. As the Antrics agreement is being negotiated, Viswanathan tells Antrics that Davos would be raising capital from the United States. And then after the agreement is... But if you look at his declaration, he says ISRO came to the United States for unrelated meetings. So, you know, I happened to try to meet with... Well, I would rest on the... It's not Antrics. These are Davos and ISRO meetings. They're kind of fortuitous. It's not as if they were... ISRO officials were coming specifically for this meeting. They were here for unrelated meetings. Well, I would rest on the district court's factual findings, Your Honor. There's the further meeting in 2009 when Antrics returns to the U.S. to check on the progress of the Davos project. But I would also point out here... But those are meetings with ISRO and not with Antrics, right? Antrics and ISRO are the same, Your Honor. It's the same chairperson. And if they're coming to discuss the progress of the Davos project, that's obviously in the Antrics' capacity because that's who the project is with, to the extent they're different at all. We agree that this would suffice under Burger King. This course of dealing would suffice under Burger King to establish personal jurisdiction. But I would emphasize that this is not a claim on the contract. This is a claim for enforcement of an arbitral award that Antrics refuses to pay, and that colors the minimum contacts analysis in two ways. One is that when it refused to pay the arbitral award, Antrics must have anticipated being hailed into court in New York Convention countries. The second point, and this gets to your question, Judge Miller, when now that liability has been determined, there is, I quote, no unfairness in allowing an action to realize on that debt in a state where the defendant has property. That's footnote 36 of Schaeffer v. Heitner. This court noted that same proposition in a New York Convention case in Glencore Green, which is cited by Antrics. Right, but in Glencore Green, I mean, we said in that case, I believe we rejected the exercise of jurisdiction because we said the plaintiff had not identified the property at issue. And so my question is, did you or did Devas articulate that as a basis for the exercise of personal jurisdiction? It was Antrics' systematic business contacts in the Western District of Washington that provided the basis for Venue. It had an ongoing contractual relationship with this company called Spaceflight, which has been the subject of post-judgment discovery since that time. That was the basis for Venue in the Western District of Washington rather than the District of Columbia. But beyond that, we now know that Antrics did indeed have property in the United States. It had this property in the Eastern District of Virginia that since has been seized. Right, but didn't, I mean, but you didn't assert that as a basis for jurisdiction when you were in the district court, did you? Or did they? I mean, at the time of the motion to dismiss, the basis of the district court's basis was that due process didn't apply. And that was the sole basis of the district court's basis, denial of the motion to dismiss on personal jurisdiction. But I think this court can affirm personal jurisdiction on any basis fairly found with the record at this point. And we know that Antrics had property in the United States. It had a receivable with Intelsat at least. And this was of course prior, this is years after, years after this arbitral award had been entered and that enforcement proceedings had begun. On the substance of the New York Convention point, first thing I have to say is that the argument now being advanced is waived. This was not an argument that was raised to the tribunal. If you look at pages 93 and 94 of the excerpts of record, you will see the jurisdictional argument that Antrics actually did make to the tribunal, and it's not the one being made here. The argument is meritless in any event. It is not correct that Article 20A of this agreement permits only an ad hoc arbitration. Article 20C provides for ICC rules, and those rules allow for the ICC court to appoint an arbitrator when a party refuses to do so. It's nothing like Al-Qarqani. In Al-Qarqani, there were no rules provided at all, and the arbitrators were being appointed in a manner that was manifestly countered. Can I ask you a question? If you just want to join the intervener's brief, then... Well, let me ask... I am the intervener's, Your Honor. Right, but the Delaware parents want to join the intervener's brief. The Delaware parents, I'm sorry, yes. Yes, Your Honor. So what is the point of them being added to the case then? Aren't their interests adequately being represented? Because now, Your Honor, the Mauritius shareholders are under attack in Mauritius in the same way Davos was attacked in India. Now the Mauritius government... But if the Delaware parents just want to join the intervener's brief, then what else are they going to add? Why aren't their interests being adequately represented, is my question. As of this moment, yes. But our concern is that tomorrow could be... As of this moment, you agree that their interests are being adequately represented? As of this moment. As I think we wrote, Your Honor, in our motion, we were seeking intervention because of the imminent threat that they could be taken over by a liquidator just as Davos Private Multimedia Limited was taken over by a liquidator. And as happened in India, the liquidator there withdrew all defenses to the set-aside proceeding. It essentially took over our entity and turned it against itself. The registration order, turning to that very quickly, this is not a final order. The order permitting registration, it does not adjudicate any claim or defense or alter the legal relationship of the parties. In Costco v. Hubbard, this Court said, when we are looking at post-judgment rulings, we look at what the real controversy is. The real controversy here is not whether there is good cause for registration. It's whether the interveners can enforce the judgment at all. But under Rule 69, that question can be answered only by reference to the state law of the enforcement court. And that is why, Judge Koh, you were asking, why is this all Washington law? Because Judge Zille looked to Washington law to determine whether our interveners could take post-judgment discovery because that was the enforcement venue. Registration, though, in Virginia is governed and execution in Virginia is governed by Virginia law. And although Antrix and the liquidator... I ask you if the registration order gives relief that's different than what DeVos requested. Is that injury for standing purposes? Is it... If you're referring to my friend's client, DeVos Private Multimedia, is it different from the relief that was requested? Are they Article III injured? I do not believe so, Your Honor, because they haven't pointed to any actual injury that they are suffering. It is something of a... Why isn't there a pecuniary injury to them? I mean, they have this judgment, which gives them the right to go and collect assets under the judgment, and now somebody else is going to go and get those assets. That seems like a fairly straightforward injury. The suggestion that we're stealing money from DeVos is wholly unfounded. If they want us to... If they've got some process for turning over the money and we want to share in it in accordance with the DMAI's collection agreement, then that could be discussed, but that hasn't... There's been no demand or anything else of the sort to this point. And so if we get to the merits of the registration, why, whether under Washington law or Indian law, why do shareholders have standing to enforce the judgment that is in the name of a corporation? So my submission, Judge Miller, is that standing to enforce the judgment is determined by the state law of the execution forum. Their shareholders' property rights in the surplus of the DeVos liquidation estate is a matter of Indian law, but the liquidator himself acknowledges that DeVos has no creditors and the shareholders are entitled to the surplus. So as the record was before Judge Zille, there was no dispute that DeVos' shareholders were entitled to the surplus. Well, the shareholders will be entitled to the surplus once the liquidator winds everything up now, but for now, in the end, but for now the corporation is still an independent entity and the corporation is the corporation and you are not the corporation, right? The shareholders are not the corporation. They are the real party in interest for this judgment. We're the only people who are actually trying to enforce the judgment. The liquidator has turned DeVos against itself. It has withdrawn defenses in India. It has acquiesced in the set-aside of the arbitral award. It has laid down and died in criminal proceedings involving our officers. Well, I mean, that's a reason. I mean, there's a sort of suggestion running through your briefs that the proceedings leading to the appointment of the liquidator were not entirely on the up-and-up, but whether or not that's true, that's not something we can fix for you, is it? No, and we're not suggesting that you can fix it, but the question here is whether we are entitled to register the judgment. You start with the text of the statute. Section 1963 imposes no limitation on who may register a judgment. The only thing that you could infer is that it has to be done by motion, and a motion has to be made by a party. We were permitted to intervene by the district court. Nobody appealed that order. It's not challenged here. We were permitted to intervene by this court. Nobody's challenged that. So we are here as parties in the case. There's nothing in the text of Section 1963 that says we cannot seek registration of the judgment. We cannot seek permission to register the judgment. So I would start with the text of the statute. There's nothing in Section 1963's purpose that would suggest we should be precluded from registering it. The purpose, as this court set forth in the Fidelity case, is to facilitate the collection of valid judgments. That's all we're trying to do. The puzzle here is why the liquidator did not join us in the Eastern District of Virginia rather than moving to quash our garnishment order. He moved to quash and then stay it. Can I ask one last question? On the forum nonconvenience point, do you think we would have to delve into whether that applies to the New York Convention, or is it a stronger ground just to say that the district court didn't abuse its discretion in finding that to access, you know, the U.S. assets? The district court did not hold that forum nonconvenience is categorically unavailable in cases under the New York Convention. That's not what it says. That's Excerpt of Record 38. It held correctly that there is no adequate alternative forum here for two reasons. There's no other nation that can provide a judgment that would have allowed the seizure of Antrix's U.S. property. And the other reason is that India, obviously, is not an adequate alternative forum here. Antrix is trying to... Antrix is refusing to pay the judgment. It's liquidated Davos upon its trumped-up findings of fraud in which the liquidator has acquiesced, and it's threatening our officers with imprisonment. So that's not an adequate alternative forum. The Antrix points to the Second Circuit's Figurito case. The key fact, missing... Okay, you answered my question. Do you think that no abuse of discretion is the stronger basis? Yes, Your Honor. Thank you. Appreciate it. Thank you. Ms. Berman. Thank you, Your Honors. I realize I don't have a lot of time. I'm going to try to quickly come back to a couple points. I heard my colleague over there say there was a waiver of the ICC ad hoc versus institutional issue before the tribunal. That's not true, Your Honor. If you look at ER-61, this is the award. It states in paragraph 15 that Antrix informed the Secretariat of the ICC Court on numerous occasions that it denied that any arbitral tribunal constituted under the ICC rules would have jurisdiction. It recognized that again on ER-91 in paragraph 140, addressing the issue more squarely, saying Antrix challenges the tribunal's jurisdiction and explains why Antrix challenges the tribunal's jurisdiction, including that the clause does not provide for ICC arbitration, but rather specifies two possible sets of arbitral rules. So I think there's very clearly no waiver here. Another thing, Your Honor, that this award says that the parties are now trying to walk away from, my colleagues on the other side, is that the tribunal refused to find that there was no distinction between Antrix and the Indian government. And you can see this at paragraph 224 of the award, where the tribunal says, we don't accept that submission. To find that a company's distinct legal personality may be disregarded simply because it's the government's marketing arm or performs commercial activities would be a significant departure from the longstanding approach of the courts of India and England. Could you respond to, and I'm sorry to interrupt you, what one of the prior counsel argued, that there would be personal jurisdiction under the FSIA because service was made and because they're trying to enforce an arbitration award. So it's one of the exceptions to foreign sovereign immunity. Your Honor, I'm not sure I'm following that argument or that it was made in the briefs here. I don't think there's any basis for distinguishing the due process that the courts in this circuit have at least said in dicta. We can argue whether it's... No, but let's say, put aside the due process. I believe it was Mr. Streeter, and I'm sorry if I'm getting counsel's names mixed up, that argued, well, we don't even have to go there. FSIA would provide the jurisdiction because we're trying to confirm an arbitration award and service was properly made, so the conditions have been satisfied. Your Honor, I don't think that's consistent with this Court's decision in Glencore Green, which was about an arbitration award. And again, you know, these are two separate exceptions under the FSIA, commercial activities, and then the arbitration enforcement exception. I've seen no court suggest that there should be a difference in whether due process requirements apply based on which exception you come under. And, Your Honor, you know, we can argue about whether Gregorian is dicta, good dicta, a holding. It's very clear that this Court has said a number of times that due process applies. It has never said or held the opposite. We don't think this should be the case where the Court does so. And, Your Honor, you asked about CORSO. I do want to come back to that because I want to make sure we're on the same page. At page 526, after the language I quoted earlier, the Court goes on to say, the dealings between the BCRP, and that's the arm of the Peruvian government, and Novotek created no minimum context with the United States. So I read that as an alternate basis for the Court's decision in that case. And then, Your Honor, I simply want to close by pointing to the very last words of CORSO, which is nothing would be more repugnant to the principle of comity than for the U.S. courts to allow a defendant's assets to be attached to enforce a Peruvian judgment when the highest court of Peru has declared that judgment null and void. We're in a similar situation here. The competent authority in India, the Delhi High Court, that's the authority that Divas argued should be the court to decide the issue, has set aside the award. We do not think the decision below can be affirmed. Whether the District Court gets back to the issue through a Rule 62.1 motion and a motion to vacate, or simply through the easier process of a limited remand so it can expand on its prior decision, these are technicalities. The issue must be addressed, Your Honor. We submit. Thank you. Thank you. And Mr. Street. Thank you, Your Honor. I want to respond quickly to two misstatements by the intervenors that are just factually incorrect. The intervenor stated that Divas does not want to enforce a stay, and it's a puzzle why we weren't in the Eastern District of Virginia. Divas is represented by an official liquidator, which is a court-appointed official, and it must follow the orders of the Indian courts. The Indian courts stayed Divas from enforcement until the Delhi High Court ruled on the set-aside proceeding. That set-aside proceeding has now been ruled on. We're no longer stayed from enforcing, and we stand ready to enforce the judgment. We also have filed briefs, and we're here this morning urging the court to affirm with respect to the confirmation of the judgment. Mr. McGill also stated that Divas has no creditors. That's not correct. They have numerous government creditors with respect to taxes and other things like that. What we have here is a court-appointed liquidator who, under Indian law, has the sole authority to enforce this judgment. The corporation continues in existence under Indian law, and even the intervenor's own declaration concedes that the shareholders have no current rights. They get the assets after the corporation is wound up, and the waterfall goes down, and they're at the very bottom as equity shareholders. The purpose of liquidation is to marshal the assets of the company, and that includes to enforce judgments. We have a judgment in the United States, which is an asset of the company that we want to enforce, and then to distribute the assets after it's wound up in the order of distribution. Our job is not to defend the management of intervenors and criminal proceedings in India. We're just very similar to a liquidator or a receiver here. Part of our duty is to investigate management and to determine what happened, but at the same time we're vigorously enforcing the assets of the company. No liquidation, either in the United States or in India, could proceed if you had shareholders and subsidiaries running around enforcing judgments. That would irreparably interfere with the liquidation process. Now, Mr. McGill suggested we should just beg them for the funds that they seized through the Eastern District of Virginia. That's not how a liquidation works. The liquidator gets the funds, and then it distributes the funds in the proper order of distribution. Finally, Your Honors, allowing the registration order to stand would effectively disregard the ruling of India's Supreme Court, which affirmed the appointment of the liquidator here and gave the liquidator the sole authority to enforce these judgments, and that would violate the principles of comity, which this Court and many other courts have applied with special force in the context of foreign bankruptcy and liquidation proceedings. So we ask the Court to reverse the registration judgment and affirm with respect to the confirmation appeal. Thank you very much. We thank all counsel for their arguments this morning and the cases submitted. You're adjourned.
judges: MILLER, KOH, Molloy